UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YURI FISCHER, an individual, on behalf of himself and on behalf of all persons similarly situated,<br><br>         Plaintiff,<br><br>v.<br><br>KELLY SERVICES GLOBAL, LLC, a Limited Liability Company; and DOES 1 through 50, inclusive,<br><br>         Defendants. | Case No.:  23-CV-1197 JLS (JLB)<br><br>**ORDER (1) DENYING PLAINTIFF'S MOTION TO REMAND TO STATE COURT AND (2) GRANTING DEFENDANT'S MOTION TO COMPEL ARBITRATION**<br><br>(ECF Nos. 13, 14) |

   Presently before the Court are Plaintiff Yuri Fischer's Motion to Remand Case to State Court ("Remand Mot.," ECF No. 13) and Memorandum of Points and Authorities in support thereof ("Remand Mem.," ECF No. 13-1).  Defendant Kelly Services Global, LLC, filed a Response in Opposition to the Remand Motion ("Opp'n to Remand," ECF No. 16), to which Plaintiff filed a Reply ("Remand Reply," ECF No. 17).  Also before the Court are Defendant's Motion to Compel Arbitration and to Dismiss or, in the Alternative, to Stay Proceedings ("Arb. Mot.," ECF No. 14) and Request for Judicial Notice ("RJN," ECF No. 14-4) in support thereof.  Plaintiff filed an Opposition to the Arbitration Motion ("Opp'n to Arb.," ECF No. 15) and Objections to Defendant's RJN ("RJN Objs.," ECF No. 15-3).  Defendant then submitted a Reply ("Arb. Reply," ECF No. 18).  The Parties

also filed Supplemental Briefs ("Def.'s Suppl. Br.," ECF No. 25; "Pl.'s Suppl. Br.," ECF No. 26) to support their respective positions regarding the Arbitration Motion.  Having carefully considered the Parties' arguments and the law, the Court **DENIES** Plaintiff's Remand Motion and **GRANTS** Defendant's Arbitration Motion.

## BACKGROUND

Defendant, a temporary staffing company, hired Plaintiff in June of 2021.  *See* ECF No. 1-3 ("Compl.") ¶¶ 2–3.  Plaintiff completed his initial employment paperwork online through Defendant's standard "eRegistration" process.  *See* Galasso Decl. Supp. Arb. Mot. ("Galasso Decl.") ¶¶ 3–6, 17, ECF No. 14-1.  As part of the onboarding process, Plaintiff encountered several forms, including a "Dispute Resolution and Mutual Agreement to Binding Arbitration" (the "Agreement" or "Arbitration Agreement").  *See id.* ¶ 6.  The company does not require California employees, like Plaintiff, to sign the Agreement as a prerequisite to employment.  *Id.* ¶ 20.  Plaintiff nevertheless signed the Agreement on June 2, 2021.  *See id.* ¶ 19; Opp'n to Arb. at 4.

Under the terms of the Arbitration Agreement, the Parties "agree[d] to use binding arbitration" for "any 'Covered Claims'" that might arise between them. Galasso Decl. Ex. B. § 1 ("Agreement"), ECF No. 14-3.  So-called "Covered Claims" "include[d] all common-law and statutory claims relating to [Plaintiff's] employment." *Id.* § 2.  The Agreement excluded, however, "unfair competition claims."  *Id.* § 3.

The Agreement also included a section titled "Arbitration Rules."  *Id.* § 4.  That provision specified that the "Agreement shall be governed by the Federal Arbitration Act" ("FAA") and, for California employees, the California Arbitration Act ("CAA").  *Id.*  The Agreement also stated that "[t]he employment dispute resolution rules of the American Arbitration Association ("AAA") effective at the time of [a dispute's] filing will apply" in arbitration.  *Id.*  A copy of said rules was to be "available at all times on MyKelly.com or upon request from [a] Kelly Representative."  *Id.*

Plaintiff stopped working for Defendant in June of 2022.  Compl. ¶ 3.  Then, on January 31, 2023, Plaintiff filed a representative action in California Superior Court against

1   Defendant for violations of California's Private Attorneys General Act of 2004 ("PAGA").
2   *See generally* RJN Ex. C, ECF No. 14-5.  The complaint in that case (the "PAGA Action")
3   alleged that Defendant had, among other things, required Plaintiff to work off the clock
4   and to skip mandated meal breaks.  *Id.* ¶¶ 1, 11.  The state court stayed the PAGA Action
5   pending the completion of arbitration proceedings after determining that the Agreement
6   applied and was enforceable against Plaintiff.  *See generally* RJN Ex. D, ECF No 14-6.

7       A few months later, Plaintiff initiated this putative class action in state court.
8   Plaintiff's Complaint raised a single unfair competition claim in violation of California
9   Business and Professional Code §§ 17200, *et. seq.*  Compl. at 1.  Much like in his PAGA
10  Action, that lone claim incorporated allegations of several different labor law violations,
11  including, *inter alia*, the alleged failure to pay employees for all time worked and the failure
12  to provide off-duty meal breaks and rest periods.  *See id.* ¶¶ 8–10.

13      On June 28, 2023, Defendant removed this case to federal court.  In its Notice of
14  Removal ("NOR," ECF No. 1), Defendant contended that removal was proper under the
15  Class Action Fairness Act ("CAFA").  *See* NOR at 2.  To support that argument, Defendant
16  asserted that the putative class included more than 100 members, that the Parties were
17  minimally diverse, and that the Complaint's claims put more than $5,000,000 in
18  controversy.  *See id.* ¶¶ 9–23.  Specifically, Defendant estimated that the total liability in
19  this case could exceed $23,000,000 based on the language of the Complaint.  *See id.* ¶ 55.
20      Plaintiff's Remand Motion and Defendant's Arbitration Motion followed.

21                          **PLAINTIFF'S MOTION TO REMAND**
22  **I.    Legal Standard**

23      Generally, defendants may remove to federal court "any civil action brought in a
24  State court of which the district courts of the United States have original jurisdiction."
25  28 U.S.C. § 1441(a).  "The propriety of removal thus depends on whether the case
26  originally could have been filed in federal court."  *City of Chicago v. Int'l Coll. of Surgeons*,
27  522 U.S. 156, 163 (1997) (citation omitted).  "The party seeking the federal forum bears
28  the burden of establishing that the statutory requirements of federal jurisdiction have been

met." *Rodriguez v. AT&T Mobility Servs. LLC*, 728 F.3d 975, 978 (9th Cir. 2013) (citing *Lewis v. Verizon Commc'ns, Inc.*, 627 F.3d 395, 399 (9th Cir. 2010)).

CAFA gives federal courts jurisdiction over class actions wherein (1) the class has 100 or more members, (2) the parties are minimally diverse, and (3) the amount-in-controversy exceeds $5,000,000.  28 U.S.C. §§ 1332(d)(2), (d)(5)(B); *see also Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013).  While courts typically "strictly construe the removal statute against removal jurisdiction," *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992), "no antiremoval presumption attends cases invoking CAFA," *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014).

To satisfy CAFA's amount-in-controversy requirement, "a removing party must initially file a notice of removal that includes 'a plausible allegation that the amount in controversy exceeds the jurisdictional threshold.'"  *LaCross v. Knight Transp. Inc.*, 775 F.3d 1200, 1202 (9th Cir. 2015) (quoting *Dart Cherokee*, 574 U.S. at 89).  At that point, the "notice of removal 'need not contain evidentiary submissions.'"  *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 922 (9th Cir. 2019) (quoting *Dart Cherokee*, 574 U.S. at 84).

When a plaintiff contests the defendant's calculations, "both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied."  *Dart Cherokee*, 574 U.S. at 88.  "The preponderance of the evidence standard, in practical terms, requires the defendant to provide persuasive evidence that 'the potential damages *could* exceed the jurisdictional amount,' as opposed to requiring 'a prospective assessment of defendant's liability' to any degree of certainty."  *Richards v. Now, LLC*, No. 218CV10152SVWMRW, 2019 WL 2026895, at *5 (C.D. Cal. May 8, 2019) (citations omitted) (quoting *Lewis*, 627 F.3d at 397, 400).

Generally, an amount-in-controversy inquiry begins with the complaint, *Greene v. Harley-Davidson, Inc.*, 965 F.3d 767, 771 (9th Cir. 2020), but parties also provide "affidavits or declarations, or other 'summary-judgment-type evidence,'" *Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015) (quoting *Singer v. State Farm*

*Mut. Auto. Ins. Co.*, 116 F.3d 373, 377 (9th Cir. 1997)).   A defendant's "damages assessment" may rely on "a chain of reasoning that includes assumptions" if such assumptions have "some reasonable ground underlying them." *Id.* at 1199.  Once a plaintiff has challenged removal, defendants must establish that their assumptions are *reasonable*, not merely plausible.  *See Arias*, 936 F.3d at 927.

In short, "CAFA's requirements are to be tested by consideration of real evidence and the reality of what is at stake in the litigation, using reasonable assumptions underlying the defendant's theory of damages exposure." *Ibarra*, 775 F.3d at 1198.  Courts "weigh the reasonableness of the removing party's assumptions" and should "not supply further assumptions of [their] own." *Harris v. KM Indus., Inc.*, 980 F.3d 694, 701 (9th Cir. 2020).  And though both parties may offer evidence, the burden of proof ultimately rests on the removing defendant.  "[I]f the evidence submitted by both sides is balanced, in equipoise, the scales tip against federal-court jurisdiction." *Ibarra*, 775 F.3d at 1199.

## II.   Analysis

The sole dispute between the Parties is whether CAFA's $5,000,000 amount-in-controversy requirement is met, as neither side disputes that the proposed class consists of more than 100 individuals or that the Parties are diverse.  Some figures are, however, not contested.  Defendant presents evidence to establish that the putative class consists of 33,055 current and former California employees who worked a total of 673,579 weeks during the relevant time period.[1]  *See* Ministrelli Decl. Supp. NOR ¶ 8 ("Ministrelli Decl."), ECF No. 1-8.  Defendant also showed that those individuals earned an average hourly wage of $22.38 per hour, or $33.57 per hour if working overtime. *Id.* ¶ 9.

To estimate the amount in controversy, Defendant separates the Complaint's allegations into four categories, including claims for: (1) minimum wage and overtime violations; (2) unpaid meal breaks; (3) unpaid rest periods; and (4) unreimbursed business expenses.  The Court will focus on the unpaid meal break and rest period claims, as they

---

[1] The Parties assume the relevant period runs from April of 2019 to July of 2023.  Ministrelli Decl. ¶ 8.

prove sufficient on their own to establish jurisdiction under CAFA.

### A.   *Defendant's Initial Estimates*

In California, employers must give their workers certain breaks.  Specifically, an employer must provide employees with a 30-minute meal break if the employee works more than five hours per day, or two such breaks if the employee works more than ten hours.  Cal. Lab. Code § 512(a).  An employer must also permit employees to take one 10-minute rest period for every four hours worked.  *See Brinker Rest. Corp. v. Sup. Ct.*, 273 P.3d 513, 528 (Cal. 2012).

Fines for noncompliance can add up quickly.  Employers must pay a premium of "one additional hour of pay at the employee's regular rate of compensation for each workday" in which a meal break or rest period is not provided.  Cal. Lab. Code § 226.7(c).  Section 226.7 has been interpreted to allow for "up to two premium payments per workday—one for failure to provide one or more meal periods, and another for failure to provide one or more rest periods."  *United Parcel Serv. Wage & Hour Cases*, 125 Cal. Rptr. 3d 384, 393 (Ct. App. 2011).

Regarding meal premiums, the Complaint alleges that Plaintiff and putative class members were "from time to time unable to take" required meal breaks.  Compl. ¶ 11.  Plaintiff further alleges that Defendant "engaged in the practice of rounding the meal period times to avoid paying penalties."  *Id.*  From those allegations, Defendant assumes each putative class member could be entitled to one hour of premium pay for every two weeks worked, NOR ¶ 42, meaning each employee worked more than five hours in a single shift without a meal break at least once every two weeks.  Based on that assumption, Plaintiff's unpaid meal premiums claim puts $7,537,349.01 in controversy.[2]

Defendant's analyzes Plaintiff's rest period claim in a similar fashion.  The Complaint alleges that Plaintiff and putative class members were "required from time to time to work in excess of four (4) hours without being provided . . . rest periods" and were

---

[2] $7,537,349.01 = $22.38 per meal break violation x (673,579 total work weeks ÷ 2).  NOR ¶ 42.

"from time to time" denied additional rest periods for longer shifts.    Compl. ¶ 12. Assuming again that each putative class member could be "entitled to one hour of premium pay per two-week period," Defendant contends that Plaintiff's rest period claim puts another $7,537,349.01 at stake.[3]

### B.    Plaintiff's Challenges

Plaintiff argues that Defendant's math is "based entirely on erroneous, unsupported, and unreasonable assumptions."  Remand Mem. at 9.  Specifically, Plaintiff contends that Defendant provided no evidence to support the assumption of one missed meal break and one missed rest period for every two weeks worked—which Plaintiff repeatedly characterizes as a "100% violation rate."  *Id.* at 12–13.  Plaintiff's argument is two-fold:[4] the Court should disregard Defendant's estimates because (1) the Complaint's "from time to time" language cannot support a "100%" violation rate; and (2) Defendant fails to present evidence "regarding which class members worked shifts entitling them to meal and rest periods."  *Id.*  The Court addresses each argument in turn.

#### 1.    Violation Rates

Plaintiff's argument betrays an apparent misunderstanding of the concept of violation rates.  Plaintiff suggests that Defendant is using a 100% rate because Defendant assumes all *class members* experienced meal break or rest period violations.  But violation rates measure the percentage of *shifts* in which putative class members experience a violation.  Put another way, "[a] 100% violation rate calculation assumes violations occurring in every identified *shift* for each class member."  *Holcomb v. Weiser Sec. Servs., Inc.*, 424 F. Supp. 3d 840, 845 n.2 (C.D. Cal. 2019) (emphasis added).  Here, Defendant assumes one violation *every two workweeks*, not every shift, per employee.

---

[3] $7,537,349.01 = $22.38 per rest period violation x (673,579 total work weeks ÷ 2).  NOR ¶ 47.

[4] Plaintiff introduces no evidence of his own to support these contentions, nor was he required to do so. *See Harris*, 980 F.3d at 700 (explaining plaintiffs "need only challenge the truth of the defendant's jurisdictional allegations by making a reasoned argument as to why any assumptions on which they are based are not supported by evidence").

That said, Plaintiff's point is not wholly without merit. Defendant expresses its violation rates in terms of workweeks but provides no evidence regarding how many shifts employees worked per week. The Court thus cannot determine what violation rate Defendant is using. For example, if class members worked an average of two shifts per week, then Defendant would be assuming a 25% violation rate (one violation per the four shifts worked over a two-week period). But if each employee worked five shifts per week, the violation rate would be only 10% (one violation per ten shifts worked every two weeks).

Still, Plaintiff's argument only takes him so far. Presumably, each putative class member worked at least one shift per week (otherwise one could hardly call it a "workweek"). Defendant thus assumes a violation rate of *at most* 50%—one violation every two shifts. The Court also notes that Defendant's meal break and rest period calculations each exceed CAFA's $5,000,000 threshold on their own. So, if one assumes employees experienced one meal break and one rest period violation every *four weeks*— meaning a maximum violation rate of 25%—the amount of controversy still far surpasses $5,000,000.[5] And assuming such a violation rate would be reasonable given the Complaint's "pattern and practice" and "from time to time" allegations. *See Arias*, 936 F.3d at 927 (stating defendant's "plausible" assumptions "may prove to be reasonable *in light of the allegations in the complaint*" (emphasis added)); *Avila v. Rue21, Inc.*, 432 F. Supp. 3d 1175, 1189 (E.D. Cal. 2020) ("District courts have found . . . violation rates of 25% to 60% can be reasonably assumed as a matter of law based on 'pattern and practice' or 'policy and practice' allegation[s]." (citations omitted)).

In any event, Defendant provides an alternative rest-period calculation that relies on a higher and more concrete violation rate. Rest periods are "time[s] during which an employee is relieved from all work-related duties and free from employer control." *Augustus v. ABM Sec. Servs., Inc.*, 385 P.3d 823, 828 (Cal. 2016). So, per the Complaint,

---

[5] $\underline{\$7,537,349.01}$ = ($22.38 for one meal break violation + $22.38 for one rest period violation) x (673,579 workweeks ÷ 4)

employers must relinquish "control over the locations where employees may take their rest period[s]" and cannot "prohibit an employee from taking a brief walk." Compl. ¶ 12. Plaintiff alleges, however, that Defendant prohibits employees from "leav[ing] the work premises during their rest period[s]." *Id.* Defendant infers from those allegations that "*none* of the rest breaks" provided "were in fact duty-free." Opp'n to Remand at 14. Assuming each putative class member "worked only one rest break-eligible shifts [sic] . . . per work week" and never received a duty-free break—*i.e.*, a 100% violation rate—the amount in controversy for unpaid rest period premiums comes to $15,074,698.02.[6] *Id.*

The Court finds an assumed 100% violation rate reasonable in this context. The Complaint alleges that Defendant "unlawful[ly]" imposes a "rule" preventing employees from taking "unconstrained walks" during their rest periods. Compl. ¶ 12. The Complaint does not qualify that allegation with the "from time to time" language used elsewhere. When not accompanied by "qualifying words such as 'sometimes' or 'often,'" allegations connoting a uniform practice can give rise to the reasonable assumption of a 100% violation rate. *Zepeda v. Mastec Network Sols., LLC*, No. 18CV00749VAPSHKX, 2018 WL 3222749, at *5 (C.D. Cal. June 29, 2018). Indeed, courts encountering claims like Plaintiff's have credited 100% violation rate assumptions. *See, e.g.*, *Herrera v. Signature Flight Support LLC*, No. 222CV03082SSSAGRX, 2022 WL 4225376, at *4 (C.D. Cal. Sept. 13, 2022) (finding 100% violation rate supported by allegation that class members "remained under defendants' control during any rest period, rendering said rest periods on duty" (emphases and citation omitted)).

### 2. *Evidence of Shift Length*

Whether Defendant produced sufficient evidence to support the assumption that each workweek included at least one rest-period or meal-break-eligible shift is a closer question. This issue arises because California law mandates breaks only when employees work shifts

---

[6] $15,074,698.02 = 673,579 workweeks x 1 shift per week x $22.38 hourly rate. Opp'n to Remand at 14.

of a certain length, so some "courts have refused to credit calculations that assume violations without considering whether the shifts in question necessarily permitted meal and rest breaks." *Alvarez v. Off. Depot, Inc.*, No. CV177220PSGAFMX, 2017 WL 5952181, at *4 (C.D. Cal. Nov. 30, 2017) (citations omitted).

On this point, Defendant's evidence does not overwhelm. Defendant establishes that Plaintiff worked for Defendant for 47 weeks, completing four to five shifts per week. Suppl. Ministrelli Decl. Supp. Opp'n to Arb. ¶ 4 ("Suppl. Ministrelli Decl."), ECF No. 16-1. Of those shifts, almost all—215—were sufficiently lengthy (four hours or more) to require a rest period. *Id.* Slightly fewer—209—were at least five hours long, and thus necessitated a meal break. *Id.* Due to the typicality requirement of class actions, "[i]t is reasonable to assume that, as the class representative, [Plaintiff's] claims are 'typical of the class.'" *Shachno v. Marriott Int'l, Inc.*, No. 22-CV-1215 TWR (JLB), 2023 WL 316367, at *6 (S.D. Cal. Jan. 19, 2023) (citation omitted). But "typical" does not mean "identical," so typicality generally "provides no grounds from which to extrapolate the amount in controversy." *Reyes v. Vitas Healthcare Corp. of Cal.*, No. 22-CV-01724-WHO, 2022 WL 1774128, at *3 (N.D. Cal. June 1, 2022).

In some cases, however, the failure to establish the length of its employees' shifts is not dispositive. "While it may be improper for [Defendant] to assume" that "violations occurred . . . some arbitrary percentage of shifts, it is not improper for [Defendant] to assume that every class member was harmed by [its] allegedly unlawful conduct." *Chan v. Panera, LLC*, No. 223CV04194JLSAFM, 2023 WL 6367677, at *3 (C.D. Cal. Sept. 28, 2023). And when a putative class has many members, their hypothetical damages add up. Of course, a defendant cannot simply assert a large putative class to satisfy CAFA; grounded, reasonable assumptions are mandatory. *See Ibarra*, 775 F.3d at 1197–98. But "the Court is not required to check its common sense at the door when it considers the evidence in support of jurisdiction under CAFA." *Chan*, 2023 WL 6367677, at *4. Evidence that may be found lacking in one case could suffice in another based on other factors, such as the proposed class's size and the complaint's allegations. *See id.*; *see also*

*Ogaz v. Honeywell Int'l, Inc.*, No. EDCV21739JFWKKX, 2021 WL 2822401, at *5 (C.D. Cal. July 7, 2021) (finding CAFA satisfied given "the size of the alleged class," "the number of claims alleged," and "Defendant's estimates").

Here, the size of the potential class—which Defendant *does* provide evidence for—is relatively large: 33,055 individuals. Ministrelli Decl. ¶ 8. In fact, this group is larger than those considered by other courts adopting similar reasoning. *See Chan*, 2023 WL 6367677, at *4 (discussing class of 17,070); *Ogaz*, 2021 WL 2822401, at *3 (evaluating 3,748-member class). Further, those 33,055 employees worked a combined 673,579 weeks. Ministrelli Decl. ¶ 8.

With these figures in mind, the Court revisits Defendant's calculations. The Court has concluded that a 100% violation rate can be reasonably inferred from the Complaint's rest-period allegations. *See supra* Section II.B.1. CAFA is thus satisfied if one assumes that each class member worked a *single* four-hour shift every *three* workweeks.[7] Said assumption is reasonable considering (1) the claims and allegations in the Complaint, and (2) evidence regarding the number of class members and how many weeks they worked. Consequently, Defendant can fulfill its CAFA burden with its alternative rest-period estimate alone. That conclusion is only strengthened by Defendant's initial meal-break estimates; if just one third of the identified workweeks featured a lone missed meal break *or* noncompliant rest-period, CAFA's threshold is similarly met. And notably, these totals do not consider the Complaints remaining allegations, of which there are many.[8]

For the foregoing reasons, Defendant has met its burden to demonstrate an amount in controversy above $5,000,000 by a preponderance of the evidence. Plaintiff's Remand Motion is therefore **DENIED**.

/ / /

---

[7] $5,024,899.34 = $22.38 average hourly rate x (673,579 workweeks ÷ 3).

[8] As the Court finds the amount in controversy met by Plaintiff's rest-period and meal-break claims, the Court need not address the Complaint's remaining allegations. *See Jauregui v. Roadrunner Transp. Servs., Inc.*, 28 F.4th 989, 995 n.8 (9th Cir. 2022).

23-CV-1197 JLS (JLB)

**DEFENDANT'S REQUEST FOR JUDICIAL NOTICE**

In support of its Arbitration Motion, Defendant asks the Court to take judicial notice of three sets of documents.  Under Federal Rule of Evidence 201(b), "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." "Accordingly, '[a] court may take judicial notice of matters of public record . . . .'" *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (first alteration in original) (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001)).  "But a court cannot take judicial notice of disputed facts contained in such public records." *Id.*

**I.     RJN Exhibits C through E: Records from Plaintiff's PAGA Action**

Defendant's first set of records are three documents from Plaintiff's PAGA Action: the initial complaint, RJN Ex. C, ECF No. 14-5; a June 15, 2023 court order, RJN Ex. D, ECF No. 14-6; and Plaintiff's declaration supporting his opposition to a motion to compel arbitration, RJN Ex. E, ECF No. 14-7.  Of those records, Plaintiff objects only to the judicial notice of Exhibit D, though he does not dispute its authenticity.  *See* RJN Objs. at 2–3.

The Court will overrule Plaintiff's objection and **GRANT** Defendant's RJN as to Exhibits C, D, and E, because "court filings and orders from other proceedings are proper subjects of judicial notice." *Sierra v. Costco Wholesale Corp.*, 630 F. Supp. 3d 1199, 1208 (N.D. Cal. 2022).  In so doing, the Court takes "notice only of the authenticity and existence of" each "order or pleading." *Eidson v. Medtronic, Inc.*, 981 F. Supp. 2d 868, 878 (N.D. Cal. 2013).  Conversely, the Court does not take "notice of any of these documents to establish the truth of the underlying factual contention or the accuracy of the legal conclusions set forth therein." *Pac. Marine Ctr., Inc. v. Philadelphia Indem. Ins. Co.*, No. 113CV00992DADSKO, 2016 WL 8730668, at *4 (E.D. Cal. Mar. 18, 2016).

/ / /

/ / /

## II.     Exhibit F: the AAA Rules

Next, Defendant seeks notice of the AAA's "Employment Arbitration Rules and Mediation Procedures" as amended and effective on January 1, 2023.  *See* RJN Ex. F (the "AAA Rules"), ECF No. 14-8.  Plaintiff raises no objection.  "The rules of the [AAA] are the proper subject of judicial notice because they can be readily . . . determined from a source whose accuracy cannot reasonably be disputed."  *Hong Kong Cont'l Trade Co. Ltd. v. Nat. Balance Pet Foods, Inc.*, No. LACV2200571JAKAFMX, 2023 WL 2664246, at *3 (C.D. Cal. Mar. 28, 2023).  The Court will thus take judicial notice of the AAA Rules.

## III.    Exhibits G through P: State and Federal Trial Court Orders

Defendant's remaining ten submissions are orders entered in federal district and California state court cases involving Defendant.  *See* RJN Exs. G–P.  In its Arbitration Motion, Defendant cites these cases to show that other courts have enforced arbitration agreements used by Defendant.  *See* Arb. Mot. at 16–17.  Plaintiff objects to only the California state trial court orders—RJN Exhibits H, I, L, O, and P—on the grounds that they lack precedential value[9] and are thus irrelevant.  RJN Objs. at 2–9.

This request suggests Defendant misunderstands the nature of judicial notice.  *See Lucero v. Wong*, No. C 10-1339 SI PR, 2011 WL 5834963, at *5 (N.D. Cal. Nov. 21, 2011) ("To use the judicial notice process to have the court consider other cases as legal authority is misguided . . . .").  Rule 201 covers "adjudicative"—not "legislative"—facts, the latter being facts "relevan[t] to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body."  Fed. R. Evid. 201 advisory committee's note to subdivision (a) for 1972

---

[9] Plaintiff makes the same point in his Opposition to Arbitration, calling the state court orders "[u]ncitable."  Opp'n to Arb. at 22.  Plaintiff forgets he is now litigating in federal court.  *See Rios v. Cnty. of Sacramento*, 562 F. Supp. 3d 999, 1021 n.3 (E.D. Cal. 2021) ("Although the California Rules of Court would prohibit [a] citation [to an] unpublished decision in a state court, those rules do not apply in federal courts . . . .").  The Court may thus "consider unpublished state court decisions" as persuasive authority, "even though such opinions have no precedential value."  *Emps. Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003).

proposed rules.  Defendant does not need to request judicial notice for the Court to consider legal authority.  *See Lemieux v. Cwalt, Inc.*, No. CV 15-77-BU-JCL, 2017 WL 365481, at \*1 (D. Mont. Jan. 25, 2017).

Accordingly, the Court **DENIES** Defendant's RJN as to Exhibits G through P.  *See Nguyen v. Cavalry Portfolio Servs., LLC*, No. 15-CV-0063-CAB-BLM, 2015 WL 12672149, at \*2 (S.D. Cal. Feb. 20, 2015) ("[A]lthough the Court considered the legal authority lodged by Defendant . . . , the requests for judicial notice of such authority are denied as unnecessary.").

## DEFENDANT'S MOTION TO COMPEL ARBITRATION

## I.    Legal Standard

The FAA governs the enforceability of arbitration agreements in contracts.  *See* 9 U.S.C. § 1, *et seq.*; *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24–26 (1991). If a suit is proceeding in federal court, the party seeking arbitration may move the district court to compel the resisting party to submit to arbitration pursuant to their private agreement.  9 U.S.C. § 4.  The FAA reflects both a "liberal federal policy favoring arbitration agreements" and the "fundamental principle that arbitration is a matter of contract."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (first quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); and then quoting *Rent-A-Ctr., West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)).

In deciding whether to compel arbitration, courts must generally "determine two 'gateway' issues: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute."  *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)).  Courts generally resolve those issues by "apply[ing] ordinary state-law principles that govern the formation of contracts."  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also* 9 U.S.C. § 2.  If the answer to both questions is yes, a court must enforce the agreement and compel arbitration.  *See, e.g.*, *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004).  Doubts regarding the

scope of an agreement must be resolved in favor of arbitration.  *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995).

The above gateway issues are "presumptively reserved for the court."  *Portland Gen. Elec. Co. v. Liberty Mut. Ins. Co.*, 862 F.3d 981, 985 (9th Cir. 2017), *as amended* (Aug. 28, 2017).  Indeed, the first question—whether an agreement exists—is non-delegable and must be decided in district court.  *See Ahlstrom v. DHI Mortg. Co., Ltd., L.P.*, 21 F.4th 631, 635 (9th Cir. 2021) ("[P]arties cannot delegate issues of formation to the arbitrator.").  But other gateway questions, "such as issues of validity and arbitrability, can be delegated to an arbitrator," *id.* at 634, if there is "clear and unmistakable evidence" that the parties agreed to such a delegation, *Portland Gen. Elec.*, 862 F.3d at 985.

## II.   Analysis

Neither party disputes that an agreement to arbitrate exists between them, *see* Arb. Mot. at 8–9; Opp'n to Arb. at 4, which settles the first gateway question.  The Parties instead argue over two issues: (1) whether the Parties agreed to arbitrate questions of arbitrability, and (2) whether the Agreement is unconscionable.  The Court addresses each question in turn.

### A.   *Delegation of Arbitrability*

Plaintiff argues that the Agreement does not cover his unfair competition law ("UCL") claim.  However, the Court cannot consider that argument if the Parties clearly and unmistakably delegated arbitrability issues—including questions of which claims the Agreement covers—to the arbitrator.  *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 528 (2019) ("When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision . . . .").  Clear and unmistakable evidence "might include . . . a course of conduct demonstrating assent" or "an express agreement."  *Momot v. Mastro*, 652 F.3d 982, 988 (9th Cir. 2011) (alteration in original) (quoting *Rent-A-Ctr.*, 561 U.S. at 79–80 (Stevens, J., dissenting)).

Defendant contends that the Parties expressly agreed to a delegation by incorporating by reference the AAA Rules, Rule 6(a) of which gives an arbitrator "the

power to rule on his or her own jurisdiction." AAA Rules at 12. Notably, the Ninth Circuit held in *Brennan* that "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." 796 F.3d at 1130. But *Brennan*'s holding was limited to its facts: an agreement between "sophisticated" parties. *See id.* at 1131. Accordingly, the Court must first ask whether *Brennan* applies in the face of Plaintiff's undisputed contention that he is an "unsophisticated" party. After concluding that the answer is yes, the Court turns to Plaintiff's remaining arguments against arbitration.

### 1. *Applicable Legal Framework*

District courts have split over whether *Brennan* impacts cases involving unsophisticated parties, *see, e.g.*, *Greenberg v. Amazon.com, Inc.*, No. 20-CV-02782-JSW, 2021 WL 7448530, at *6 (N.D. Cal. May 7, 2021) (describing the split in authority), and reports of an established majority approach may be greatly exaggerated.[10] The Parties make no effort to persuade the Court to choose one position over the other. Plaintiff simply cites cases holding incorporation of the AAA Rules is insufficient where one party is unsophisticated. *See Meadows v. Dickey's Barbecue Rests. Inc.*, 144 F. Supp. 3d 1069, 1078–79 (N.D. Cal. 2015); *Ingalls*, 2016 WL 6679561, at *3–4. And Defendant relies on authority going the other way. *See Bazine v. Kelly Servs. Glob., LLC*, No. 22-CV-07170-BLF, 2023 WL 4138252, at *5–6 (N.D. Cal. June 21, 2023).

/ / /

---

[10] *Compare, e.g.*, *Maybaum v. Target Corp.*, No. 222CV00687MCSJEM, 2022 WL 1321246, at *5 (C.D. Cal. May 3, 2022) ("[T]he majority of courts have concluded that *Brennan* applies equally to sophisticated and unsophisticated parties."), *and Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 992 (N.D. Cal. 2017) (stating "the clear weight of authority supports the conclusion" that incorporation of AAA rules "provide[s] clear and unmistakable evidence of the parties' intent to delegate . . . arbitrability" regardless of the sophistication of the parties), *with Eiess v. USAA Fed. Sav. Bank*, 404 F. Supp. 3d 1240, 1253 (N.D. Cal. 2019) ("[T]he majority of the lower courts in the Ninth Circuit have 'held that incorporation of the AAA rules was insufficient to establish delegation in consumer contracts involving at least one unsophisticated party.'" (quoting *Ingalls v. Spotify USA, Inc.*, No. C 16-03533 WHA, 2016 WL 6679561, at *4 (N.D. Cal. Nov. 14, 2016))), *and Magill v. Wells Fargo Bank, N.A.*, No. 4:21-CV-01877 YGR, 2021 WL 6199649, at *5 (N.D. Cal. June 25, 2021) ("Where at least one party is unsophisticated, judges in this district routinely find that the incorporation of the AAA rules is insufficient to establish a[n] . . . agreement to arbitrate arbitrability.").

Lacking binding precedent or guidance from the Parties, the Court returns to first principles.  When the FAA covers an agreement, "federal law governs the arbitrability question by default."  *Brennan*, 796 F.3d at 1129.  And under federal arbitrability law, courts determine whether parties agreed to arbitrate a claim by (1) "apply[ing] ordinary state-law principles" governing contract formation; and (2) resolving ambiguities in favor arbitration.  *First Options*, 514 U.S. at 944–45.  Said presumption favoring arbitration arises from the FAA's "permissive policies" regarding arbitration and the assumption that "when the parties have a contract that provides for arbitration of some issues," they "likely gave at least some thought to the scope of arbitration."  *Id.* at 945.  In other words, the very existence of an arbitration agreement suggests the parties intended to arbitrate their disputes.  But the same does not hold true for the question of who should decide arbitrability—a "rather arcane" issue parties might easily overlook.  *See id.*  So, when deciding whether a party agreed to arbitrate *arbitrability*, the presumption cuts the other way and clear and unmistakable evidence is necessary.

Though it represents a "heightened standard," *Rent-A-Ctr.*, 561 U.S. at 69 n.1, satisfying the clear-and-unmistakable-evidence requirement is no Herculean task.  The rule demands only that an agreement *unambiguously* state "*who* (primarily) should decide arbitrability."  *First Options*, 514 U.S. at 944.  Much like other questions arising from the FAA, that analysis focuses on "the parties' manifestation of intent."  *Rent-A-Ctr.*, 561 U.S. at 69 n.1 (emphasis omitted); *see also Momot*, 652 F.3d at 986 (explaining that in interpreting an arbitration agreement covered by the FAA, "as with any other contract, the parties' intentions control" (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626 (1985))).

Further, while federal arbitrability law sets a different standard when it comes to the delegation of arbitrability issues, state-law principles remain relevant.  "An agreement to arbitrate a gateway issue"—like arbitrability—is "simply an additional, antecedent agreement . . . , and the FAA operates on this . . . agreement just as it does on any other."  *Rent-A-Ctr.*, 561 U.S. at 70.  So, as with other applications of the FAA, "state law is not

entirely displaced." *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 936 (9th Cir. 2001). Consequently, in determining the parties' intent, courts employ state-law principles of contract formation as required and modified by federal arbitrability presumptions and precedent. *See First Options*, 514 U.S. at 944–45; *Cooper v. Agrify Corp.*, No. C21-0061RSL-JRC, 2022 WL 2374587, at *3 (W.D. Wash. June 2, 2022) (applying "Washington's ordinary principles of contract formation" to "the issue of mutual assent" pursuant to "the precepts and presumptions of federal arbitration law").

In sum, the Court must decide whether the parties unambiguously decided who should answer arbitrability questions.  The Court's analysis is guided by federal arbitrability case law and informed by state-law contract principles.  If the Court finds that the Agreement is "silent or ambiguous" on the question of who decides arbitrability, the Court must address the remaining gateway issues.  Otherwise, those questions are for the arbitrator.

### 2.    Analysis

In California,[11] "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting." *Johnson v. Walmart Inc.*, 57 F.4th 677, 682 (9th Cir. 2023) (alteration in original) (quoting Cal. Civ. Code § 1636). "[T]he best indicator of the parties' intent in a written contract is the words they chose for the agreement." *Nelson v. Dual Diagnosis Treatment Ctr., Inc.*, 292 Cal. Rptr. 3d 740, 749 (Ct. App. 2022).  Said words are typically interpreted "by application of the plain meaning rule" and are "given their usual and ordinary meaning." *Johnson*, 57 F.4th at 682 (citing *Valencia v. Smyth*, 110 Cal. Rptr. 3d 180, 197 (Ct. App. 2010)).  If after that analysis "a contract is capable of two different reasonable interpretations, the contract is ambiguous." *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1285 (9th Cir. 2009) (quoting *Oceanside 84, Ltd. v. Fid. Fed. Bank*, 66 Cal. Rptr. 2d 487, 492 (Ct. App. 1997)).

---

[11] Though the Agreement states that disputes shall be governed by Michigan law, Agreement § 5, the Parties agree that California law applies here, *see* Opp'n to Arb. at 20; Arb. Reply at 8.

As the language at issue here enters the contract by way of incorporation, if at all, the Court must determine whether the AAA Rules are "part" of the Agreement before interpreting the Parties' chosen wording.

a.    Incorporation by Reference

Documents incorporated by reference into a contract are considered part of the agreement.  *See Republic Bank v. Marine Nat. Bank*, 53 Cal. Rptr. 2d 90, 90 (Ct. App. 1996) ("The phrase 'incorporation by reference' makes the document referred to part of the contract *as if it were recited verbatim*.").  Generally, a document may be "incorporated by reference in a contract so long as (1) the reference is clear and unequivocal, (2) the reference is called to the attention of the other party and he consents thereto, and (3) the terms of the incorporated document are known or easily available to the contracting parties."  *DVD Copy Control Assn., Inc. v. Kaleidescape, Inc.*, 97 Cal. Rptr. 3d 856, 870 (Ct. App. 2009).

With the above principles in mind, the Court finds that § 4 of the Agreement incorporates the AAA Rules by reference.  Under that provision, "[t]he employment dispute resolution rules of the [AAA] effective at the time of filing will apply." Agreement § 4.  While a "mere reference to the AAA" would not be enough, *Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051, 1068 (9th Cir. 2020), identifying the AAA's *rules* and clarifying that they will apply to disputes arising from the contract is sufficient, *see Brennan*, 796 F.3d at 1128–30 (finding rules incorporated where contract specified that claims "shall be settled by binding arbitration in accordance with the Rules of the [AAA]"); *see also Galilea, LLC v. AGCS Marine Ins. Co.*, 879 F.3d 1052, 1062 (9th Cir. 2018) (accepting similar provision).

Disagreeing, Plaintiff first notes that available documents on the "AAA's Employment Arbitration" website include "Employment Arbitration Rules & Mediation Procedures," "Employment Arbitration Rules Fee Schedule," and "Employment Arbitration Rules Demand for Arbitration Form."  Herman Decl. Supp. Opp'n to Arb. ("Herman Decl.") Ex. 1, ECF No. 15-1.  Plaintiff argues that one cannot "know what rules

are purportedly incorporated by reference if they are not even labeled correctly."  Opp'n to Arb. at 13.  But only one of the listed documents refers clearly to rules and procedures.[12]  Moreover, the Agreement does not refer employees to the AAA's website but instead to "MyKelly.com" or a "Kelly Representative."  Agreement § 4.

Plaintiff's citation to *Chango Coffee, Inc. v. Applied Underwriters, Inc.*, 217 Cal. Rptr. 3d 924 (Ct. App. 2017), aids him not.  Per Plaintiff, that case illustrates the difficulty of determining which of "two documents" with "similar names" was "meant to be incorporated."  Opp'n to Arb. at 13.  He neglects to mention that *Chango Coffee* merely notes the "two document" issue in its "Facts and Procedural Background Section"; the opinion itself addresses an unrelated jurisdictional issue.  *See* 217 Cal. Rptr. 3d at 926, 928.  Nor does Plaintiff acknowledge that the trial court *did* find that a specific document had been incorporated.  *See id.* at 926.

Next, Plaintiff points out that the AAA Rules are not attached to the Agreement but are "only accessible by link."  Opp'n to Arb. at 13.  But courts analyze the accessibility of incorporated documents when discussing unconscionability, not incorporation.  *See Baltazar v. Forever 21, Inc.*, 367 P.3d 6, 13 (Cal. 2016) ("[C]ourts will more closely scrutinize the substantive unconscionability of terms that were . . . incorporate[ed] . . . rather than . . . attach[ed] . . . ."); *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1262 (9th Cir. 2017) (applying *Baltazar*).  *Harper v. Ultimo*, which Plaintiff relies on, follows the same trend.  *See* 7 Cal. Rptr. 3d 418, 422–23 (Ct. App. 2003) (finding incorporation of unattached rules relevant to procedural unconscionability).  Nor is Plaintiff helped by *McKee v. Audible, Inc.*, which focused on the vagueness of a reference to external documents and not on whether said documents were attached to the agreement.  *See* No. CV 17-1941-GW(EX), 2017 WL 4685039, at *10 (C.D. Cal. July 17, 2017) (explaining that "terms found here" does not clearly reference the "terms contained *in all*

---

[12] One does not need legal training to surmise that a "Fee Schedule" is typically a list of fees, or to guess that a "Demand for Arbitration Form" is likely a form that can be filled out and used to demand arbitration.

*seven of the agreements* listed" on a hyperlinked page).

Finally, Plaintiff claims the Agreement could not have incorporated the version of the AAA Rules at issue as they did not exist at the time the Agreement was signed.[13]  *See* Opp'n to Arb. at 13.  The Court is not persuaded.  The Agreement incorporates the version of the AAA Rules that is "effective at the time of [a dispute's] filing."  Agreement § 4.  Courts applying federal arbitrability law have found similar language sufficient to incorporate future versions of the AAA's rules.[14]  Meanwhile, Plaintiff's authorities are distinguishable as they discuss incorporation by reference in contexts not relevant here.  *See In re Wunderle's Est.*, 181 P.2d 874, 878–79 (Cal. 1947) (determining whether a document was incorporated into a holographic will); *People v. Egan*, 190 Cal. Rptr. 546, 549 (Ct. App. 1983) (analyzing incorporation in the context of a search warrant).

b.     The Delegation Provision

Having found that the Agreement incorporates the AAA Rules, the Court turns to the purported delegation provision therein.  Per AAA Rule 6(a), "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."  AAA Rules at 12.  As its text is part of the Agreement by way of its incorporation, *see Republic Bank*, 53 Cal. Rptr. 2d at 90, the Court looks to the plain meaning of Rule 6(a) and asks whether it unambiguously states "*who* (primarily) should decide arbitrability," *First Options*, 514 U.S. at 944.  The inescapable answer is yes: "the arbitrator" decides.  *See Momot*, 652 F.3d at 988 ("[T]his language, delegating to the arbitrators the authority to determine

---

[13] The Parties executed the Agreement in June of 2021, while the AAA Rules submitted by Defendant were not revised until January of 2023.  *See* Opp'n to Arb. at 13.

[14] *See Bazine*, 2023 WL 4138252, at *5; *McKellar v. Mithril Cap. Mgmt. LLC*, No. 19-CV-07314-CRB, 2020 WL 1233855, at *4 (N.D. Cal. Mar. 13, 2020) ("[W]hen an agreement incorporates AAA rules which provide for application of the most up-to-date version of the rules, that agreement incorporates the current version of the rules."); *Marriott Ownership Resorts, Inc. v. Flynn*, No. CIV. 14-00372 JMS, 2014 WL 7076827, at *14 (D. Haw. Dec. 11, 2014) (applying 2014 AAA Rules to agreements from 1999 and 2001 because the parties agreed "to be bound by the AAA rules, as amended, 'in the form obtaining at the time the demand for arbitration . . . is received'" (alteration in original)).

21

'the validity or application of any of the provisions of' the arbitration clause, constitutes 'an agreement to arbitrate threshold issues . . . .'" (quoting *Rent-A-Ctr.*, 561 U.S. at 68)).

The Court hesitates, however, to end its inquiry there.  Plaintiff asks how he could "express 'clear and unmistakable' intent to bind himself to a set of rules that did not yet exist." Opp'n to Arb. at 13.  The argument is reasonable.  The clear-and-unmistakable test exists to prevent parties from being forced to arbitrate arbitrability absent evidence they "gave at least some thought" to the "significance of having arbitrators decide the scope of their own powers." *First Options*, 514 U.S. at 945.  Arguably, then, incorporation alone cannot be dispositive.  If the version of the AAA's rules in existence when the Agreement was executed contained no delegation clause for the Parties to consider, incorporating said rules would say little about whether the Parties contemplated the significance of such a provision at the time.  Put another way, the incorporation of the AAA Rules can provide clear and unmistakable evidence of an intended delegation only if the Rules contained a delegation provision when the Agreement was signed—June 2, 2021.  Galasso Decl. ¶ 19.

Though Plaintiff's point is well taken, it ultimately does not alter the Court's conclusion.  AAA Rule 6(a) has remained unchanged since at least 2009.  *See* Am. Arb. Ass'n, *Employment Arbitration Rules and Mediation Procedures* 12 (2009),[15] https://www.adr.org/sites/default/files/Employment%20Arbitration%20Rules%20and%20Mediation%20Procedures%20Nov%2001%2C%202009.pdf ("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."); *see also Maguire Ins. Agency, Inc. v. Amynta Agency, Inc.*, 652 F. Supp. 3d 1313, 1321 (W.D. Wash. 2023) (quoting the 2009 version of AAA Rule 6(a)).  Consequently, the AAA Rules contained a delegation provision for the Parties to consider when they entered into the Agreement.

---

[15] The Court may take judicial notice pursuant to Federal Rule of Evidence 201(b) of facts "that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," including rules taken from the AAA's website. *Jackson v. Tic–The Indus. Co.*, No. 1:13-CV-02088-AWI, 2014 WL 1232215, at *8 n.2 (E.D. Cal. Mar. 24, 2014) (citing *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir.1993)).

1    Plaintiff's remaining counterarguments fare no better.  Plaintiff cites *Beco v. Fast*

2    *Auto Loans, Inc.* for the proposition that AAA Rule 6 only "permits"—but does not

3    require—an arbitrator to rule on their own jurisdiction once an action is "already in

4    arbitration."  Opp'n to Arb. at 12 (citing 302 Cal. Rptr. 3d 168 (Ct. App. 2022)).  But *Beco*

5    draws its reasoning from a California state-court case that predates several binding federal

6    arbitrability decisions.  *See* 302 Cal. Rptr 3d at 178 (quoting at length and relying

7    extensively on *Ajamian v. CantorCO2e, L.P.*, 137 Cal. Rptr. 3d 773 (Ct. App. 2012)).

8    Indeed, *Ajamian* predates *Brennan*, which found a similarly worded delegation provision

9    to clearly delegate arbitrability issues.  *See* 796 F.3d at 1128.  Further, *Beco* bases its ruling

10   in part on the fact that the contract before it was an employment agreement,

11   302 Cal. Rptr. 3d at 178, a factor the Ninth Circuit has found to be of little consequence,

12   *see Brennan*, 796 F.3d at 1131.

13   Finally, Plaintiff contends that the AAA Rules apply only "if this matter is sent to

14   arbitration," but this action "should never" reach arbitration because his UCL claim is

15   expressly excluded from the Agreement.  Opp'n to Arb. at 10.  However, if an arbitration

16   agreement "contain[s] an enforceable delegation clause, all arguments going to the scope

17   or enforceability of the arbitration provision are for the arbitrator to decide."  *Caremark,*

18   *LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022).  Such scope issues include

19   whether Plaintiff's claim is covered by the Agreement.  *See, e.g.*, *S.S. ex rel. Stern v.*

20   *Peloton Interactive, Inc.*, 566 F. Supp. 3d 1019, 1043–44 (S.D. Cal. 2021) ("Mr. Stern and

21   Peloton agreed to arbitrate gateway issues, including whether Mr. Stern's claims fall within

22   the scope of the Arbitration Provision.").  *Perez v. Discover Bank* does not help Plaintiff;

23   there, the court found that a plaintiff's claims were not covered by an arbitration agreement

24   because *no such agreement existed*.  74 F.4th 1003, 1011 (9th Cir. 2023).

25   For the reasons above, the Court holds that the Agreement clearly and unmistakably

26   delegates arbitrability issues to the arbitrator.[16]

27   _____

28   [16] The sophistication of the Parties ultimately did not play in the Court's analysis, and perhaps that is not

### B.      Unconscionability

Plaintiff also seeks to defeat Defendant's Arbitration Motion on unconscionability grounds.  Under § 2 of the FAA, arbitration agreements can "be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability."  *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 999 (9th Cir. 2021) (quoting *Poublon*, 846 F.3d at 1259).  In California, "unconscionability has both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results."  *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1210 (9th Cir. 2016) (internal quotation marks omitted) (quoting *Armendariz v. Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 690 (Cal. 2000)).  Plaintiff, as the party opposing arbitration, must demonstrate both forms of unconscionability, though they "need not be present in the same degree."  *Lim*, 8 F.4th at 1000 (quoting *Poublon*, 846 F.3d at 1260)).

Before it can contemplate the merits of Plaintiff's unconscionability argument, the Court must determine whether it can entertain that argument at all.  As the Parties delegated arbitrability issues, questions regarding the unconscionability of the Agreement *as a whole* fall to the arbitrator, not the Court.  *See Rent-A-Ctr.*, 561 U.S. at 70–71.  On the other hand, the Court must decide "whether the particular agreement to *delegate* arbitrability—the Delegation Provision—is itself unconscionable" if Plaintiff poses that question.  *Brennan*, 796 F.3d at 1132; *see also Saperstein v. Thomas P. Gohagan & Co.*, 476 F. Supp. 3d 965, 974 (N.D. Cal. 2020) ("[I]f a party challenges specifically the enforceability of the

---

surprising.  The Ninth Circuit went out of its way to avoid "foreclose[ing] the possibility that [*Brennan*'s] rule could also apply to unsophisticated parties."  796 F.3d at 1130.  The court also noted that "the vast majority of the circuits" in agreement with *Brennan* did not "explicitly limit[]" their "holding[s] to sophisticated parties."  *Id.* at 1130–31.  Further, state contract principles and federal arbitrability law both focus on giving effect to parties' intentions, which are best surmised from plain contractual language.  Meanwhile, whether a party can avoid the enforcement of an unambiguous provision due to their lack of sophistication seems like a question of fairness more appropriately considered in an unconscionability inquiry.  *See Razzaghi v. UnitedHealth Grp.*, No. SACV1801223AGJDEX, 2018 WL 7824552, at \*2 (C.D. Cal. Sept. 17, 2018); *see also Esquer v. Educ. Mgmt. Corp.*, 292 F. Supp. 3d 1005, 1012 n.2 (S.D. Cal. 2017) (stating that an inquiry into a party's sophistication "may be better suited to a court's determination of whether a delegation clause is unenforceable because it is unconscionable").

delegation clause, the district court must consider the challenge, but if a party challenges the . . . arbitration agreement as a whole, the challenge is for the arbitrator.").

To challenge the delegation's validity, Plaintiff must both mention the delegation provision *and* make arguments specific to it. *See Rent-A-Ctr.*, 561 U.S. at 72–74.[17]  The bare assertion that a delegation clause is unconscionable does not suffice. *See Zeevi v. Citibank, N.A.*, No. 219CV02206GMNBNW, 2021 WL 621423, at *3 (D. Nev. Feb. 16, 2021) (finding challenge was only to entire agreement where plaintiff "d[id] not specifically challenge the delegation clause beyond the unsubstantiated claim that it is unconscionable").  Plaintiff may "cite[] provisions outside of the delegation clause" in making his unconscionability argument if he also "explain[s] how those provisions make the fact of an arbitrator deciding arbitrability unconscionable." *Holley-Gallegly v. TA Operating, LLC*, 74 F.4th 997, 1002 (9th Cir. 2023) (emphasis omitted).

Here, the bulk of Plaintiff's procedural unconscionability arguments are aimed squarely at the Agreement as a whole.[18]  And while Plaintiff attacks the fairness of incorporating the AAA Rules, he does so only to bolster his argument that the entire Agreement is unconscionable.[19]  Challenging the incorporation of the AAA Rules without discussing the delegation provision contained therein does not satisfy *Rent-A-Center*'s requirements.  *See Mercado v. Sally Beauty Supply LLC*, No. 215CV02316KJMCKD, 2016 WL 3361883, at *4 (E.D. Cal. June 16, 2016) (holding plaintiff failed to "challenge the delegation provision in particular" because she "d[id] not argue the provision

---

[17] After briefing on the Arbitration Motion was complete, the Ninth Circuit confirmed this reading of *Rent-A-Center*. *See Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1009–10 (9th Cir. 2023) ("[A] party resisting arbitration must mention that it is challenging the delegation provision and make specific arguments attacking the provision in its opposition to a motion to compel arbitration.").

[18] *See, e.g.*, Opp'n to Arb at 15 ("The Arbitration Agreement is Procedurally Unfair."); *id.* at 16 ("The Agreement itself is a contract of adhesion.").

[19] *See* Opp'n to Arb. at 17 (asserting that because "Defendant failed to attach the [AAA] Rules," the "Agreement is procedurally unconscionable"); *id.* at 19 ("[I]f the AAA's Rules are incorporated . . . , then there are . . . pages of detailed convoluted rules which Plaintiff did not see . . . . Therefore, the Agreement is procedurally unconscionable.").

incorporating the AAA rules is unconscionable *as applied to the delegation provision* or argue the specific delegation provision violates her due process rights" (emphasis added)).

Plaintiff's substantive unconscionability arguments trod the same path.  Plaintiff first argues that the *Agreement* is substantively unconscionable in light of its choice-of-law clause, the statute of limitations it imposes, and the one-sided nature of the claims that— under Defendant's interpretation—it covers.  *See* Opp'n to Arb. at 19–20.  At no point does Plaintiff "explain how those provisions make *the fact of an arbitrator deciding arbitrability* unconscionable."  *Holley-Gallegly*, 74 F.4th at 1002.  As Plaintiff does not aim his arguments at the delegation provision, the Court cannot consider them.  *See Mohamed*, 848 F.3d at 1210 ("When considering an unconscionability challenge to a delegation provision, the court must consider only arguments 'specific to the delegation provision.'" (quoting *Rent-A-Ctr.*, 561 U.S. at 73)).

Only one of Plaintiff's unconscionability arguments directly targets the delegation provision.  Plaintiff contends that the delegation clause was "buried" within the AAA Rules.  Opp'n to Arb. at 21.  The presence of difficult-to-find terms can establish a degree of procedural unconscionability.  *See Baltazar*, 367 P.3d at 12–13; *Lim*, 8 F.4th at 1001.  And California courts may "more closely scrutinize the substantive unconscionability of terms that were 'artfully hidden' by the simple expedient of incorporating them by reference."  *Baltazar*, 367 P.3d at 13 (quoting *Harper*, 7 Cal. Rptr. 3d at 422).  Here, Plaintiff argues, it would be substantively unconscionable to deprive him of the opportunity to have "the Court decide gateway issues of arbitrability" based on an obscure contractual clause that was not attached to the Agreement.  Opp'n to Arb. at 21.

Though specific to the delegation provision, Plaintiff's final unconscionability argument still fails.  The "threshold inquiry in California's unconscionability analysis" is whether the arbitration agreement at issue is "adhesive."[20]  *Mohamed*, 848 F.3d at 1211

---

[20] An "adhesive" agreement is a "standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the

(quotation marks omitted) (quoting *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1281 (9th Cir. 2006)).  Plaintiff does not contend that the *delegation provision* was adhesive, so his argument fails at the first step.   *See Zeevi*, 2021 WL 621423, at *3 (declining to consider argument in part as plaintiff "fail[ed] to explain the significance of an alleged contract of adhesion with particular respect to the delegation clause").   Additionally, Plaintiff must establish some degree of procedural *and* substantive unconscionability to prevail.  But here, he neglects the latter by not explaining *why* the delegation provision is "overly harsh, unduly oppressive, or unfairly one-sided."  *Lim*, 8 F.4th at 1002; *see also A.C. ex rel. Carbajal v. Nintendo of Am. Inc.*, No. C20-1694 TSZ, 2021 WL 1840835, at *3 (W.D. Wash. Apr. 29, 2021) (rejecting substantive unconscionability argument where plaintiff claimed AAA's delegation provision "put him at a disadvantage" but "d[id] not explain how those rules disadvantage[d] him").

Plaintiff has not sufficiently challenged the validity of the delegation provision—which was incorporated by reference into the Parties' Agreement and unambiguously delegates arbitrability issues to the arbitrator—and Court must enforce the Agreement accordingly.  *See Rent-A-Ctr.*, 561 U.S. at 72–74; *Henry Schein*, 139 S. Ct. at 527–28; *Brennan*, 796 F.3d at 1133–34.  Defendant's Arbitration Motion is **GRANTED**.

### C.   *Impact on Plaintiff's Complaint*

The Court must still decide what happens to Plaintiff's Complaint.  The Parties advocate for different next steps.  Defendant asks the Court to dismiss the Complaint.  Arb. Mot. at 20–21.  Countering, Plaintiff contends that Defendant, in arguing that the Court "has the jurisdiction to dismiss claims under the Agreement," has "implicitly conceded" that the Court ought to rule on gateway issues of arbitrability.  Opp'n to Arb. at 24.  Plaintiff seems to assume that the Court cannot dismiss the Complaint unless the Court first determines that the Agreement covers his UCL claims.  *See id.*  Notably, Plaintiff does not

---

contract or reject it."  *Armendariz v. Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 689 (Cal. 2000) (quoting *Neal v. State Farm Ins. Cos.*, 10 Cal. Rptr. 781, 784 (Ct. App. 1961)).

opine on what action the Court should take if it were to decide—as the Court does here—to grant Defendant's Arbitration Motion.[21]

To the extent Plaintiff contends that Defendant cannot simultaneously argue that dismissal is appropriate and that the Court lacks the power to decide arbitrability issues, he is mistaken.  In the Ninth Circuit, a district court has the discretion to stay *or dismiss* claims subject to a valid arbitration agreement.  *See Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d 1072, 1073–74 (9th Cir. 2014).  Defendant's arguments are thus not in conflict, though there is a "preference for staying an action pending arbitration rather than dismissing it."  *MediVas, LLC v. Marubeni Corp.*, 741 F.3d 4, 9 (9th Cir. 2014).

That said, Plaintiff's broader argument regarding the as-yet unanswered arbitrability questions has merit.  The Court decides in this Order only that the Parties agreed to delegate questions of arbitrability, not that Plaintiff's UCL claims are in fact arbitrable.  The arbitrator will therefore need to decide such questions as whether Plaintiff's claims are covered by the Agreement and whether the Agreement as a whole is unconscionable.  "Because it is not certain that [Plaintiff's] claims will remain in arbitration, outright dismissal is not appropriate."  *Ramirez v. Elec. Arts Inc.*, No. 20-CV-05672-BLF, 2021 WL 843184, at *5 (N.D. Cal. Mar. 5, 2021).  The Court will thus stay this action pending the completion of arbitration.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiff's Remand Motion (ECF No. 13), **GRANTS** Defendant's Arbitration Motion (ECF No. 14), and **STAYS** this action pending the completion of arbitration proceedings pursuant to 9 U.S.C. § 3.  The Parties

/ / /

/ / /

---

[21] Plaintiff's Opposition to Arbitration does include section titled "Plaintiff's Motion Should Not Be Stayed."  Opp'n to Arb. at 24.  There, Plaintiff appears to argue that the present action should not be stayed pending the individual arbitration ordered in his state-court PAGA action.  *See id.*  The Court does not read Plaintiff to be asking the Court to dismiss his Complaint—rather than stay it—in light of the Court's decision to grant Defendant's Arbitration Motion.

**SHALL FILE** a joint status update on the arbitration proceedings <u>every 120 days</u>, starting from the date of this Order, <u>and within 14 days of the proceedings' completion</u>.

      **IT IS SO ORDERED.**

Dated:  January 30, 2024

Hon. Janis L. Sammartino
United States District Judge

23-CV-1197 JLS (JLB)